C.T-J.
ORIGINAL

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

2015 FEB -3  PM 4: 15

CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| TPG GLOBAL, LLC, a limited liability company,<br><br>    Plaintiff,<br>v.<br><br>ADAM LEVINE, an individual.<br><br>    Defendant. | Civil Action No.4:15-CV-00059-A |

### APPENDIX IN SUPPORT OF PLAINTIFF'S
### MOTION FOR PRELIMINARY INJUNCTION

In accordance with Local Rule 7.1(i) of the Northern District of Texas, Plaintiff TPG Global, LLC files this Appendix in Support of Plaintiff's Motion for Preliminary Injunction, containing the following:

| EXHIBIT | DESCRIPTION | APP. |
|---|---|---|
| A | Declaration of Clive Bode in Support of Plaintiff's Motion for Preliminary Injunction | 04 |
| A-1 | Confidentiality Agreement | 10 |
| A-2 | TPG Employee Agreement – Mobile Data Device | 13 |

Page 1

Respectfully submitted,

*/s/ Marshall Searcy*
_____
Constantine Z. Pamphilis
State Bar No. 00794419
KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
700 Louisiana Street
Suite 2200
Houston, TX 77002
Telephone: (713) 220-8800
Facsimile: (713) 222-0843
dpamphilis@kasowitz.com
ATTORNEY-IN-CHARGE
FOR PLAINTIFF TPG GLOBAL, LLC

Marc E. Kasowitz
Admitted *Pro Hac Vice*
KASOWITZ, BENSON, TORRES &
 FRIEDMAN LLP
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800
mkasowitz@kasowitz.com

Marshall M. Searcy, Jr.
State Bar No. 17955500
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
(817) 878-3512
Fax: (817) 878-9280
marshall.searcy@kellyhart.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on 3rd day of February, 2015, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

_____
Marshall M. Searcy, Jr.

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| TPG GLOBAL, LLC, a limited liability company,<br><br>        Plaintiff,<br>v.<br><br>ADAM LEVINE, an individual.<br><br>        Defendant. | Civil Action No.4:15-CV-00059-A |

## DECLARATION OF CLIVE BODE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

CLIVE BODE, pursuant to 28 U.S.C. § 1746, declares as follows:

1. My name is Clive Bode. I am of sound mind, over eighteen years of age, and fully competent to make this declaration. I have personal knowledge of the facts stated in this declaration. All of the facts stated in the declaration are true and correct.

2. I am currently a senior partner and counsel at TPG Global LLC ("TPG") and I have been since 2006. In this capacity I have I have personal knowledge of the facts set forth herein and if called as a witness, I could and would competently testify thereto.

3. I submit this affidavit in support of TPG's application for a preliminary injunction. TPG is entitled to the relief sought in its motion for preliminary injunction pursuant to the terms of the Confidentiality Agreement and TPG Employee Use Agreement executed by Adam Levine ("Levine') and the facts set forth herein.

4. TPG is a leading global private investment firm headquartered in Fort Worth, Texas.

5. TPG hired Levine as a member of the TPG's public affairs team in early 2008. Levine's responsibilities included responding to public relations inquiries and issues. In that role, Levine occupied a position of trust and confidence that afforded him access to sensitive non-public, internal, confidential, and proprietary information about TPG and its business and operations, including its strategic planning.

6. As part of his employment at TPG, Levine entered into several agreements that were intended to protect the confidential financial and business information of TPG and its investors.

7. The Confidentiality Agreement signed by Levine expressly stated that TPG agreed to give Levine access to:

    certain confidential, non-public and proprietary information concerning the business and operations of TPG; its affiliates, related persons and entities; the investment funds managed by TPG; the investors in such investment funds; the portfolio companies of such investment funds; and certain information provided to TPG by third parties (collectively, "Confidential Information"). (*See* a true and correct copy of the Confidentiality Agreement, signed by Adam Levine, attached hereto as Exhibit A-1)

8. As a condition to and in consideration for access to the confidential information described in the attached agreement, Levine agreed that he: "will hold Confidential Information in strict confidence and will not disclose to any person or entity any Confidential Information in any manner whatsoever except as such disclosure may be required in connection with [Levine's] employment by TPG, or unless authorized in writing by TPG."

9. The Confidentiality Agreement further stated that, upon written request, Levine "will promptly return to TPG all documents, notes and other tangible materials representing the Confidential Information and all electronic copies thereof."

    Levine also executed the TPG Employee Use Agreement – Mobile Data Device (the "Mobile Device Agreement"), which expressly referenced and incorporated the Confidentiality Agreement to require Levine to keep confidential and not disclose any Confidential Information maintained on Levine's company-provided laptop and mobile device. (*See* a true and correct copy of the TPG Employee Use Agreement-Mobile Data Device, signed by Adam Levine, attached hereto as Exhibit A-2)

10. Levine was also required to comply with his confidentiality obligations as set forth in TPG's Employee Handbook.

11. Levine's position provided him access to detailed information, including but not limited to, information concerning TPG's current investments, and more importantly, information regarding potential investments and acquisition targets, information and materials, including highly sensitive financial information regarding TPG's private, non-public portfolio companies, detailed information regarding TPG's proprietary investment strategies, lists and information regarding prospective clients and sources for potential financing.

12. TPG took numerous steps to maintain the confidential nature of its proprietary information and trade secrets including but not limited to: having all TPG employees execute confidentiality and nondisclosure agreements, password protecting all access to

TPG's email/file/backup servers and controlling access into TPG's offices through keycards.

13. TPG's relationship with Levine began to deteriorate when he was not promoted to partner in June 2014. In the months following Levine's initial ramblings over not making partner, TPG began vetting proposals to expand their public relations department Levine informed TPG's senior firm partners that he wanted to lead TPG's proposed expanded public affairs department

14. When Levine learned in October 2014 that he might be passed over for this new role, he threatened in a series of discussions and emails to disclose and disseminate TPG's confidential information in a way that would "take down" TPG.

15. Levine's repeated use of war references – including referring to himself as a "weapon of mass destruction" and warning TPG that it was risking a "live fire exercise" – raised concerns at TPG. Those concerns escalated after Levine began accusing various TPG officers of conspiring against him.

16. In early November 2014, TPG offered Levine a six month "cooling off" period during which he would have the opportunity to demonstrate he was qualified to lead the proposed expanded public affairs department. Levine eventually rejected this proposal and demanded that he be given a severance package instead.

17. During the ensuing weeks of discussions about his severance, Levine did not mention any specific acts of alleged wrongdoing at TPG, other than his criticism of officers whom he blamed for preventing him from taking leadership of TPG's public affairs department.

18. Levine sent an email on November 5, 2014, to Jim Coulter, one of TPG's founding partners, stating in general terms his dissatisfaction and concerns with TPG.
Mr. Coulter and I agreed to meet Levine in person to discuss his concerns. During our meeting on November 9, 2014, Levine did not raise or discuss any acts of alleged wrongdoing by TPG, nor did he claim he was a whistleblower.

19. On November 18, 2014, Levine sent an email to both of TPG's founding partners, Mr. Bonderman and Mr. Coulter, and me, detailing TPG's public affairs transition plan. Nowhere in this multi-page email did Levine raise concerns about any alleged improprieties or wrongdoing at TPG. In the email Levine wrote he was in discussions with the principals of an outside consulting firm to join that firm.

20. From the time Levine was informed about the cooling-off period, he began to make plans to resign from TPG, including engaging in discussions with other potential employers, collecting information concerning his past compensation, and sending an email stating that his administrative assistant would be leaving TPG when he did. He informed me and other partners of these plans both verbally and in emails.

21. Although TPG was not aware at the time, a subsequent investigation revealed that in December 2014, amid continuing negotiations about his severance package, Levine began entering TPG's San Francisco office after work hours and on holidays (including Christmas Eve and Christmas Day). During those visits, Levine downloaded confidential TPG documents to his laptop from TPG's Texas computer servers, according to TPG's records, and further took unspecified hard copy documents

22. In late December, several days prior to December 24, 2014, TPG refused Levine's demand for a seven- to eight-figure separation payment. Levine responded with a rambling email on December 24, 2014, in which he for the first time claimed he was a "whistleblower."

23. In his December 24, 2014 email, Levine made a series of accusations about the firm, and in particular about a TPG officer that he blamed for his failure to make partner. Levine concluded: "I think it best if TPG came up with a new offer given the facts and circumstances as articulated above. Please know that I wish to settle this matter without having to involve external entities – but that choice, gentlemen, rests firmly in your hands." A review of relevant materials confirms Levine's allegations about the firm are false.

24. On December 30, 2014, a reporter for the New York Times told a TPG employee that he had received internal TPG e-mails from an unnamed source. The reporter subsequently provided TPG with one such TPG e-mail from November, 2013, that contained TPG's confidential information related to TPG's internal billing process.

25. TPG determined the email, which was sent to the New York Times, had been altered and was accessible to only a very limited number of TPG personnel, including Levine. TPG also discovered that Levine had forwarded an unaltered copy of the leaked e-mail to his personal e-mail address on December 20, 2104, just 10 days before the New York Times contacted TPG.

26. On December 31, 2014, after learning Levine improperly disclosed confidential information to the New York Times, TPG notified Levine in writing that his employment was terminated and demanded the immediate return of all confidential information in his possession, as well as his company-provided laptop and mobile device.

27. TPG, upon learning Levine had been downloading its internal confidential information, during non-work hours, conducted a forensic evaluation of its computer servers in Fort Worth, Texas. This evaluation revealed Levine had accessed information from the firms servers, located in Fort Worth, Texas that contain archived documents and emails, during the times he was removing confidential information on nights and weekends in late December.

28. On January 30, 2015, TPG was informed by a reporter from the Huffington Post that a TPG internal document and a TPG internal video presentation were leaked to the

Huffington Post. TPG has determined that no copies of the video sent to the Huffington Post still existed at TPG at the time the Huffington Post received the internal TPG video.

29. Levine had access to both this document and video, while at TPG, and is the most probable source of this recent leak of internal confidential information to the press.

30. To date, Levine has ignored TPG's multiple requests to return all confidential information in his possession, as well as his company-provided laptop and mobile device, both of which contain improperly downloaded confidential materials according to TPG records.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Clive Bode

Dated:    February 3, 2015
         Austin, Texas

# Exhibit A-1

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement ("Agreement"), dated as of _____, _____, governs the disclosure of Confidential Information by TPG Capital, L.P. and its affiliates (collectively, "TPG") to the undersigned ("Employee").

1. <u>Confidential Information</u>. The Employee has been in the past and/or will be given in the future access to certain confidential, non-public and proprietary information concerning the business and operations of TPG; its affiliates, related persons and entities; the investment funds managed by TPG; the Investors in such investment funds; the portfolio companies of such investment funds; and certain information provided to TPG by third-parties (collectively, "Confidential Information"). As a condition to and in consideration of Confidential Information being furnished to the Employee, the Employee agrees to treat Confidential Information in accordance with the provisions of this Agreement and to take or refrain from taking the other actions hereinafter set forth.

2. <u>Nondisclosure of Confidential Information</u>. The Employee will hold Confidential Information in strict confidence and will not disclose to any person or entity any Confidential Information in any manner whatsoever except as such disclosure may be required in connection with Employee's employment by TPG, or unless expressly authorized in writing by TPG. The Employee will immediately notify TPG in the event of any loss or unauthorized disclosure of any Confidential Information.

3. <u>Return of Information</u>. Upon the written request of TPG, the Employee will promptly return to TPG all documents, notes and other tangible materials representing the Confidential Information and all electronic and hard copies thereof.

4. <u>Subpoena or Court Order</u>. In the event the Employee receives a request to disclose all or any part of the Confidential Information under the terms of a subpoena or other order issued by a court of competent jurisdiction or by another governmental agency, the Employee will (i) promptly notify TPG of the existence of such a request, (ii) consult and cooperate with TPG in its efforts to obtain assurance that confidential treatment will be accorded to Confidential Information to be disclosed, and (iii) furnish only such portion of Confidential Information that is legally required to be disclosed.

5. <u>Securities Laws</u>. The Employee is aware that the securities laws of the United States and other relevant jurisdictions prohibit any person who has material, non-public information concerning publicly trade securities from purchasing or selling such securities or from communicating such information to any other person when it is reasonably foreseeable that such person is likely to purchase or sell such securities.

6. <u>Remedies</u>. The Employee agrees that a breach of this Agreement will cause TPG irreparable damage for which recovery of damages would be inadequate, and that TPG shall therefore be entitled to obtain injunctive and other equitable relief under this Agreement, as well as such further relief as may be granted by a court of competent jurisdiction.

TPG Capital Employee CA Dec 2006

7. <u>Governing Law.</u> This agreement shall be governed by and construed in accordance with the laws of the State of Texas without reference to conflict of laws principles.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the first date written above.

EMPLOYEE  
Signed: _____  

Name: __1/1/2008_____

TPG CAPITAL, L.P.  
By: Tarrant Capital, LLC, its general partner

By: _____  
Clive Bode, Vice President

# Exhibit A-2

## TPG EMPLOYEE USE AGREEMENT – MOBILE DATA DEVICE

This Employee Use Agreement (this "Agreement"), dated as of 6 Feb 2014, governs the use by employees of TPG Capital, L.P. ("TPG") and certain of TPG's affiliates of mobile data devices such as iPad, iPhone, Blackberry, and Android based devices ("Mobile Device") for TPG business purposes.

In consideration of TPG providing information technology access services ("IT Access") to the undersigned employee of TPG ("Employee") in connection with Employee's use of his or her Mobile Device for TPG business purposes, Employee hereby acknowledges and agrees as follows:

1. **TPG Information Systems Use Policies.** Employee and Employee's Mobile Device are subject to TPG's Information Systems Use Policies, a copy of which is attached hereto as Annex A (as amended from time to time, the "Policies"), and Employee will comply with the Policies in connection with Employee's use of his or her Mobile Device. Notwithstanding anything contained in the Policies to the contrary, TPG consents to (i) the use of the Mobile Device by the Employee, (ii) the remote access by the Employee to the TPG network by means of the Mobile Device and (iii) the storing by the Employee of TPG business documents or communications on the Mobile Device.

2. **Confidentiality Agreement.** Any Confidential Information accessed by Employee on his or her Mobile Device is subject to that certain Confidentiality Agreement previously executed between Employee and TPG (the "Confidentiality Agreement"), and Employee will comply with the terms of such Confidentiality Agreement in connection with Employee's use of his or her Mobile Device. The term "Confidential Information" has the meaning ascribed to such term in the Confidentiality Agreement.

3. **Termination of IT Access.** Employee acknowledges that Employee has no right to IT Access for his or her Mobile Device, and TPG may terminate IT Access for such Mobile Device at any time and for any reason, without notice, including in the event that TPG determines, in its sole discretion, that Employee has violated the Policies, the Confidentiality Agreement or any other applicable TPG compliance policies or procedures in connection with Employee's use of his or her Mobile Device.

4. **TPG Access and Removal of Information.** Immediately upon request from TPG, Employee agrees to deliver the Mobile Device to TPG, and Employee agrees that TPG may search, extract, review, produce or disclose any information stored on the Mobile Device as TPG deems appropriate in its sole discretion. Employee further agrees that TPG may erase at any time, remotely or otherwise, any or all of the information contained on the Mobile Device to the extent TPG determines that such action is necessary to protect information TPG deems confidential or proprietary.

5. **TPG Option.** In order to facilitate TPG's compliance with its legal obligations, Employee hereby grants to TPG an irrevocable option and right to acquire any Mobile Device used by Employee during Employee's employment with TPG (the "Option"). The Option shall become exercisable immediately upon notice of the termination of Employee's employment with TPG, regardless of the reason for such termination, whether such termination is for cause or

2

otherwise, and whether such notice is provided by TPG or Employee, and shall expire at 11:59 pm, Pacific Time, on the fifth (5th) business day after the date such notice of termination is given (the "Option Period"). In order to exercise the Option, TPG shall provide notice to Employee during the Option Period and, as soon as reasonably practical thereafter, shall provide Employee with a replacement Mobile Device, which shall be a reasonably comparable, new model Mobile Device. If TPG exercises the Option, Employee will immediately deliver to TPG any Mobile Device used during Employee's employment with TPG and execute any documents necessary to irrevocably assign all Employee's right, title and interest in and to any such Mobile Devices to TPG.

6. Document Preservation. In connection with any request from TPG pursuant to Section 4 or TPG's exercise of the Option pursuant to Section 5, Employee will refrain from deleting or modifying any file stored on any Mobile Device used during Employee's employment with TPG and otherwise continue to comply with any applicable document retention and preservation obligations to TPG in respect of any such Mobile Devices.

7. Employee Acknowledgment. Employee hereby acknowledges that (a) TPG is not responsible for backing up or synchronizing any data stored on Employee's Mobile Device and (b) if TPG erases any information contained on the Mobile Device pursuant to Section 4 or exercises the Option pursuant to Section 5, any information stored on the Mobile Device and not previously backed up by Employee (including without limitation any personal files or applications) will be lost forever.

8. Employee Release. In consideration of TPG providing the IT Access, Employee does hereby irrevocably and unconditionally release, acquit and forever discharge TPG and its affiliates and employees of any and all claims, liabilities, damages and causes of action of any nature whatsoever arising in connection with or otherwise related to TPG providing the IT Access and any action taken in connection therewith, including without limitation any claim relating to lost data, as described in Section 7.

9. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, without regard to the laws of conflict of laws.

10. Entire Agreement. This Agreement (including any Annex hereto) represents the entire understanding and agreement of the parties hereto with respect to the matters contained herein.

11. No Waiver. No failure or delay by TPG in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

12. Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same Agreement, and may be delivered by facsimile or other reliable electronic means.

*[Remainder of Page Intentionally Left Blank]*

3

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the first date written above.

**RECIPIENT**

Signed: /s/ Adam Levine
Name: Adam Levine

**TPG CAPITAL, L.P.**

By: TPG Capital Advisors, LLC
    General Partner

By: /s/ Ronald Cami
Name: Ronald Cami
Title: Vice President

## ANNEX A

## TPG INFORMATION SYSTEMS USE POLICIES

SEE ATTACHED.